EAST MOLINE CO. v. WEIR PLOW CO.

(Circuit Court of Appeals, Seventh Circuit.   June 6, 1899.)

No. 551.

1. REVIEW—FAILURE TO AWARD NOMINAL DAMAGES.
    A judgment will not be reversed because of an error in failing to award nominal damages, where the question of costs is not dependent thereon.

2. BREACH OF CONTRACT—LIQUIDATED DAMAGES—PENALTY.
    Where a contract contains a large number of stipulations to be performed, of varying degrees of importance, and for the breach of some of which the damages are readily ascertainable, while as to others they are not, a single sum stipulated as damages for a breach, and applicable alike to each of the covenants, will be treated as a penalty, and in an action for a breach only the actual damages proved are recoverable.

In Error to the Circuit Court of the United States for the Southern Division of the Northern District of Illinois.

This suit was brought by the Weir Plow Company, the defendant in error, upon the written contract hereinafter fully set out in the findings of fact by the court below to recover the sum of $50,000 as damages provided for by the contract for a breach by either party. The defendant answered by counterclaim, alleging performance of the contract on its part, alleging a breach of the contract by the plaintiff .(defendant in error), and claiming judgment for the $50,000 as stipulated damages. No proof of damages was offered by either party on the trial, but each party sought to recover from the other the sum of $50,000 as stipulated damages. The finding, as will be seen, is in favor of the plaintiff in error (defendant below) that the contract had been kept by it up to the time plaintiff defaulted, and had been broken by the plaintiff. The error assigned is that the court erred in not giving damages in favor of the plaintiff in error: (1) In not giving nominal damages; (2) in not giving judgment in favor of the defendant for $50,000 as stipulated damages.

The finding of facts and conclusions of law by the court are as follows:

"The court finds: That the defendant, the East Moline Company, was on and prior to July 12, 1895, a land company, owning unimproved lands near the city of Moline, upon which it was proposed to build up a manufacturing town by bringing to the same some important manufacturing establishments. That for this purpose it advertised its willingness to grant a parcel of its lands, with railway and other facilities, and a money bonus, to some well-known and well-established company that would establish its plant at that site. That the Weir Plow Company, then located at Monmouth, Illinois, agreed to accept such offer. A correspondence thereupon took place, which resulted in the making, on the 12th of July, 1895, of the following contract:

" 'Exhibit Letter E. No. ———.

" 'Newton Woodson, Peoria, Ill.: This agreement, made and entered into this 12th day of July, 1895, by and between the East Moline Co., a corporation organized under the laws of West Virginia, with its principal office at Moline, Ill., party of the first part, and the Weir Plow Co., of Monmouth, Ill., a corporation existing under the laws of the state of Illinois, party of the second part, witnesseth: Party of the first part, for and in consideration of the covenants and agreements on the part of the party of the second part hereinafter mentioned, hereby covenants, promises, and agrees as follows: That it will donate and convey, free of incumbrance, to the party of the second part, that part or parcel of land lying between the C., R. I. & P. and the C., B. & Q. tracks as shown on the working plan of the East Moline Co.'s tract, east of Port Byron Junction, between the Third and Fourth avenues running north and south, said parcel being on the old Davenport farm, and containing nineteen acres, more or less, less a right of way thirty feet wide on the northern boundary of said parcel, and a right of way sixty feet wide on the south boundary of said parcel, the same to be described more fully by metes and bounds in deed hereafter. Said party

of the first part, in addition, agrees to donate as a further consideration for the removal as hereinafter specified, to the party of the second part, fifty thousand dollars in cash, as follows: $5,000.00 November 1st, 1895, $5,000.00 January 1st, 1896, $5,000.00 April 1st, 1896, $5,000.00 June 1st, 1896, $5,000.00 August 1st, 1896, $5,000.00 October 1st, 1896, $5,000.00 November 1st, 1896, $5,000.00 April 1st, 1897, $5,000.00 June 1st, 1897, $5,000.00 August 1st, 1897. It is hereby expressly agreed that none of the above payments shall be due or called for except to pay for 75 % of the cost of labor and material then used in the construction of buildings as shown by certificate of architect, until the buildings are fully completed, when full settlement shall be made as per schedule above. It is hereby agreed that the East Moline Co. shall, not later than Nov. first, 1896, execute its three promissory notes for the last three amounts hereinbefore stated, said notes to bear six per cent. interest from Nov. 1st, 1896, and not to be used nor discounted in any of the banks of Rock Island, Moline, or Davenport.

## " 'Steam-Railroad Service.

" 'Said party of the first part further agrees from and after the date of the operation of said second party's factory at East Moline that until street-car service is provided, as hereinafter specified, it will arrange with steam railroads running into East Moline (or Port Byron Junction) to run trains as follows: Leaving Rock Island or Moline so as to arrive at East Moline 5 to 15 minutes before 7 a. m. Leaving Rock Island or Moline so as to arrive at East Moline 5 to 15 minutes before 1 p. m. Leaving East Moline about 12:15 p. m., reaching Rock Island. Leaving East Moline about 6:15 p. m., reaching Rock Island. With such additional trains as may be put on between hours, conditioned that said trains are to be passenger trains with sufficient capacity to transport workmen to and from Moline or Rock Island and East Moline for the factory purpose of the party of the second part, and that the fare for such service, in books of 25 tickets, shall not exceed 5 cents per fare one way between Moline and East Moline, it being agreed and understood that the party of the first part will, at as early a date as practicable, endeavor to arrange that all railroads reaching Port Byron Junction and running passenger trains have such trains stop at Port Byron Junction to let off and put on passengers.

## " 'Street-Car Service.

" 'Party of the first part agrees that on or before Nov. 1st, 1897, it will have an electric, or other rapid transit street-car line reaching up to a point opposite Port Byron Junction, and that the fare for such street-car service shall not exceed 5 cents from Moline to Port Byron Junction, either way, and that timely service of said street cars, to correspond and fully equal that of the street cars above enumerated, shall be furnished with intermediate trips of at least once every hour.

## " 'Switching Facilities.

" 'Said party of the first part agrees to procure an agreement from the three trunk railroads, namely, the C., R. I. & P., the C., B. & Q., and the C., M. & St. P., that such railroads shall put in main switching tracks to and on the boundary of the land occupied by the said second party, and that the said three railroads shall each agree to use such switch tracks for in and out bound freight on an equal basis, said main switch to be put in immediately on said second party being ready to commence erecting its buildings.

## " 'Water Supply.

" 'The party of the first part agrees that it will provide a temporary and sufficient supply of water for the use of the party of the second part for putting up and operating said plant and supplying boilers and other machinery, and that within one year from the first day of July, 1896, said party of the first part agrees to lay an eight-inch main from the boundary of said second party's land to the Mississippi river, and to erect a pumping station to furnish a permanent supply of water to the party of the second part for its manufacturing purposes, at a price not exceeding the ruling price of water at Moline or Rock Island, and will also permit said second party the free use of said first party's mains until said pumping station is in operation. Said first party also agrees to deed to

said second party perpetual easement for a water pipe from factory of said second party to the Mississippi river.

### " 'Lighting Station.

" 'It is further agreed that, as soon as the buildings hereinbefore proposed are erected, that party of the first part will arrange to supply a sufficient amount of electric light, or other satisfactory illuminant, at ruling rates as furnished by other companies, for the wants of the party of the second part for streets and private lighting.

" 'In consideration of the covenants and agreements hereinbefore mentioned by the party of the first part, the party of the second part hereby agrees at once to prepare plans and specifications for a complete, new, and improved, and up to date plant, which plans and specifications shall be ready not later than October 1, 1895, and that contract shall be let and work upon the buildings commenced as soon as possible thereafter, and that it will remove its business of manufacturing agricultural implements from Monmouth, Illinois, to East Moline, Illinois, and will erect upon said ground hereinbefore mentioned and designated substantial brick buildings to cost not less than fifty thousand dollars, said buildings to be completed and erected January 1, 1897, unless deterred by fires, strikes, or unavoidable accidents. Foundations and buildings to the extent of ten thousand dollars to be put up in the fall of 1895, so as to commence active building operations on March 1, 1896. In addition to the erection of the buildings as above stated, party of the second part agrees to remove its machinery now at its factory in Monmouth, Illinois, or such portion as it may wish to use in its new plant, and to add thereto such new machines as its requirements may demand, for the employment of 300 to 500 employés, it being agreed and understood that it is the intention of the party of the second part, and said second party hereby agrees, to remove its manufacturing business from its present location in Monmouth, Illinois, to East Moline, Illinois, and thereafter conduct such manufacturing business with such enlargements and additions as the business of said second party properly pushed may demand.

" 'It is made a part of this agreement that said second party shall keep the grade of the product of its factory up to the high standard recently attained under the Kingman management, and that this shall be done by employing first-class labor and using first-class material, and by adopting modern processes of manufacture, so that the goods turned out shall be equal to those of any first-class factory of like kind in the market; also that the name "East Moline, Ill.," shall be prominently branded on all of the goods made by said second party; also that the corporate title of the Weir Plow Co. shall be changed to the "Kingman Plow Co."; also that advertising matter shall be printed and the new concern known as the "Kingman Plow Co., late the Weir Plow Co.," so as to get the benefit of both names, and cement the alliance between the factory and the Kingman jobbing houses as far as possible. The Weir Plow Co. and Martin Kingman and William Hanna hereby agree and guaranty that the name "Weir Plow Co." shall not be used by any other corporation, and that no other plow factory under that name shall occupy the old and abandoned plant at Monmouth for a term of five years.

" 'Party of the second part agrees that it will at all times give the preference in letting contracts for buildings and in the purchase of machinery to be used in the erection of said buildings to contractors, builders, and furnishers of said machinery in Rock Island county. Said party of the second part hereby agrees that, in consideration of the agreements herein contained on the part of the East Moline Co., that said party of the second part will at all times, in hiring employés, give the preference to competent persons living on the land owned or controlled by the East Moline Co. or its grantees, and that the said party of the second part shall, so far as possible, limit its employment of help to competent persons living upon land owned or controlled by said East Moline Co. or its grantees.

" 'It is further agreed on the part of the party of the second part that in letting its contracts for buildings, it will likewise stipulate with the contractor that he shall give like preference to competent persons living on the land of the said East Moline Co. or its grantees.

" 'It is agreed that the party of the second part shall remove its office to

East Moline from Monmouth, Ill., and locate permanently upon the site and in the buildings hereinbefore mentioned, on or before Nov. 1, 1896.

" 'Said party of the second part further agrees to keep said buildings insured for three-fourths of their insurable value, and, in case the plant is destroyed by fire, to rebuild the same, and to continue said business, as soon as such insurance on said buildings is adjusted.

" 'Said party of the second part further agrees to employ in the transaction of its business upon the premises aforesaid as large a number of employés as the demand for its goods will warrant, it being expected and understood that it shall employ at first about the same number of men as it is now employing at Monmouth, Ill., and to increase the same as the further exigencies of the business may warrant; and it also agrees to enlarge and extend its business as a permanent business in its new location.

" 'It is agreed by and between the parties hereto, that they shall meet in Chicago within the next week for the purpose of agreeing with said railway companies upon the location of their several freight depots and union passenger station at East Moline, and that, if said visit is made, and does not result in satisfactory arrangements, said second party shall be at liberty, up to and including July 20, 1895, to cancel this agreement.

" 'It is hereby mutually agreed by and between the parties hereto that the measure of damages for the default of either party to carry out this agreement shall be fifty thousand dollars, less such sums as may have been paid by either party to the other.

" 'In witness whereof, the said East Moline Company has executed the presents by the signature of its president and secretary, and by its corporate seal, and the party of the second part has also acknowledged these presents by the signature of its president and secretary and its corporate seal.'

"That the location and building of the Weir Plow Company's works in East Moline within the time stipulated in the contract was important to the interests of the East Moline Land Company in its purpose to sell other lots, and procure other manufacturers, and that this was well known to the parties of the contract, and in mind when the contract was entered into; whereby the court finds that in respect to the location, plans of the building, the laying of the foundations of the buildings, and the completion of the same, as provided in the contract, time was an essential consideration of the contract. The court finds that the plaintiff employed to draw up said plans one White, then and afterwards a stockholder in the East Moline Company; that the plans were not prepared as provided for by the contract, namely, October 1st; that the deed presented by the defendant for lands was found to need correction and reforming, which was done within a couple of weeks after the 1st of October, 1895; and that neither party undertook at the time—October 1st—to take advantage of the other on their failure to perform the exact details provided for in the contract. The court finds that the plans in the hands of Mr. White were not finished until about the 1st of November; that bids were then received, which, in the aggregate, amounted to about $100,000; whereupon the plans were revised so that the buildings to be erected according thereto, would not have cost much to exceed, if anything, $50,000. The court finds that the said plaintiff, upon the coming in of the revised plans, took no immediate bids in the carrying out of the same, and, on the 12th day of December, 1895, having suffered fire at its works at Monmouth, concluded not to commence building in the fall of 1895. The court finds that the defendant, having full knowledge of the plaintiff's intention in the premises, elected not to thereupon annul the contract, but waived its performance within the time originally named, upon condition that the plans and the bids for the buildings should be so far advanced during the winter that work might begin early in the spring, not later than March. The court finds that the plaintiff took no diligent steps to complete the plans or obtain bids during the winter, or to get the enterprise in such situation that actual work upon the buildings might begin in March, or the opening of the spring, but, on the contrary, delayed doing anything until May, 1896. The court finds that thereupon, in May, 1896, a conference was had between the plaintiff and the defendant, wherein the plaintiff offered to proceed to erect the buildings, as provided for in the contract, provided the defendant would waive the delay up to that time; but that the defendant refused to make

any such waiver, but expressly stated that the plaintiff might proceed if it pleased,. the defendant reserving the right to hold the plaintiff accountable for the delay, according to the letter of the contract. The court finds that the plaintiff, with full knowledge of this expressed purpose of the defendant, proceeded thereafter with the plans and bids, so that in June ground for the buildings was broken upon the land previously deeded to them by the defendant, and proceeded to build until the cost of the structure amounted to about $7,000, whereupon they called upon the defendant to give them the first $5,000 bonus provided for in the contract. The court finds that the defendant refused to advance said bonus, still claiming its right to damage for the delay, whereupon the plaintiff quit work on the buildings, and nothing more, except such as was necessary to close the buildings against the weather, has since been done. The court finds that the defendant, except a few delays in the matter of railway switches, and water (unsubstantial in themselves, and of no effect in causing the plaintiff's delay), performed on its part each and all the stipulations of the contract up to the date when the plaintiff quit work. The court finds that the plaintiff broke the contract as modified as aforesaid, in a substantial way, in not making plans and taking bids during the winter, and in not beginning the work before June, 1896. The court further finds that whatever injury the defendant suffered in the matter of the sale of its lots, as well as injury to other prospects, by reason of the plaintiff's failure to complete plans and take bids in the winter, or lay the foundations for its buildings in March, it is impossible to ascertain; but the greatest injury in that respect was caused by the delays in the autumn of 1895. There is no evidence that any considerable portion of such damage would have been repaired had the plaintiff proceeded to lay its foundations for its buildings in March, 1896. The court finds that on the 19th of August, 1896, the plaintiff wrote to the defendant, among other things, as follows:

" 'We therefore give you notice of your default in the carrying out of the agreement, and in consequence of such default we have the right to elect to declare said contract forfeited, and void; and we do elect, and hereby notify you that we shall from this time forth consider said contract forfeited, and void, and have no force or effect, so far as we are concerned. But nevertheless we have the right to recover from you under the guaranty on said contract whatever damages we may have suffered, to wit, the amount of $50,000, and we hereby notify you that we have suffered damages to a large amount, largely in excess of $50,000, and that we shall hold you and your guarantors responsible for such damages. We hereby notify you that we have expended, in constructing buildings upon the real estate at East Moline which you have conveyed to us in the neighborhood of $10,000, and upon repayment to us of the amount so expended we will be willing, and hereby offer, to convey to you the said premises, free and clear from all claim or lien incurred by us. Yours, truly,

" [Signed]                                    The Weir Plow Co.'

"The court further finds that upon the foregoing facts the plaintiff is not entitled to recover from defendant. The court further finds that upon the foregoing facts the defendant is not entitled to recover on its set-off from the plaintiff. The court finds the issues on the original case brought by the plaintiff against the defendant in favor of the defendant and against the plaintiff."

E. McGinnis, for plaintiff in error.

W. W. Hammond, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge, upon this statement of the case, delivered the opinion of the court.

The principal contention in the case is whether the court erred in not giving judgment for the defendant below for the amount claimed as stipulated damages. The finding of facts being in favor of the defendant and against the plaintiff, it seems evident that nom-

inal damages might have been awarded to the defendant upon its counterclaim. The requirement for nominal damages, however, would be satisfied with a judgment for one cent, and the case might be reversed for not so awarding, if the rendering of a judgment for costs had depended thereon. But, so long as judgment for costs was given in favor of the defendant, we cannot reverse the judgment because one cent or five cents did not go with the judgment for costs, as nominal damages. It is presumable, under the circumstances, that the failure to allow nominal damages with the judgment for costs was the result of inadvertence. Laubenheimer v. Mann, 19 Wis. 519; Eaton v. Lyman, 30 Wis. 41; Hibbard v. Telegraph Co., 33 Wis. 558; Smith v. Machine Co., 26 Ohio St. 562; Mahoney v. Robbins, 49 Ind. 146; Palmer v. Degan, 58 Minn. 505, 60 N. W. 342.

But on the main question, of giving judgment for the $50,000 provided for in the contract, we think there was no error. The case is clearly one coming within the rule long ago laid down by the English and American courts, that where the agreement secures the performance or omission of various acts, together with one or more acts in respect to which the damages on a breach of the covenants are certain and readily ascertainable, and there is a sum stipulated as damages to be paid by each party to the other for a breach of any of the covenants, such sum is a penalty merely. Astley v. Weldon, 2 Bos. & P. 346–353; 3 Pars. Cont. (8th Ed.) 161, and cases cited in footnote; Bagley v. Peddie, 5 Sandf. 192; Trower v. Elder, 77 Ill. 452; Lyman v. Babcock, 40 Wis. 517.

The supreme court of Illinois, in Trower v. Elder, supra, laid down the rule as follows:

"Where there are several covenants or stipulations in an agreement, the damages for the nonperformance of some of which are readily ascertainable by a jury, and the damages for the nonperformance of the others are not measurable by any exact pecuniary standard, and a sum is named as damages for a breach of any of the covenants or stipulations, such a sum is held to be a penalty."

This principle, we think, is fairly applicable to the case at bar. Here are a great number of stipulations upon the part of either party, of varying importance, in regard to some of which the damages for nonperformance are readily ascertainable by a court or jury, while some are clearly of the contrary character, with one general provision for damages, equally applicable to each and all the various covenants. Take the one on plaintiff's part, for instance, providing that the buildings shall be kept insured for three-fourths their insurable value. The damages for a breach of such a stipulation are readily ascertainable by a court or jury. The same rule holds in regard to the provision for employing a certain number of men. Suppose a lesser number than 300 were employed; could it be supposed that the parties intended that the damages for employing only 275 men at the plant, instead of 300, should be $50,000? There are also various provisions on the part of the defendant below, like those in regard to providing street-car service, water supply, lighting station, and switching facilities, where the damage could no doubt be separately assessed in case of a breach, and where it would do violence to suppose that the parties could ever have intended that $50,000 should

be the stipulated sum to be paid for a breach of any one of these minor provisions. Where there are so many and various separate cove- nants upon either part to be performed, of varying importance, if the parties intend to stipulate the same large sum to be paid upon any breach, without any regard to the degree of importance it may have in the general scheme of the parties, certainly they should be required to make their meaning plain; and, if they do not make it clear that such was the intent, it is the more reasonable construction to construe such provision for damages as a penalty. This leaves each party free to prove the damages actually sustained. Again, if the intention in such a case is to make the agreed damages apply to some particular main provision of the contract, and not to all, this, also, should be made manifest by express terms.

In Taylor v. Sandiford, 7 Wheat. 13, Chief Justice Marshall lays down the rule somewhat more broadly than the subsequent English and American decisions would warrant, as follows:

"In general, a sum of money in gross, to be paid for the nonperformance of an agreement, is considered as a penalty, the legal operation of which is to cover the damages which the party in whose favor the stipulation is made may have sustained from the breach of contract by the opposite party."

While that case was, no doubt, correctly decided, the general doc- trine there laid down does not seem to take proper account of the cases where it is evident that the damages for a breach would be un- certain in their nature, and impossible of ascertainment by a jury. In these cases it is entirely proper for the parties to agree upon the amount of damages, and such agreements are upheld by, and are not in disfavor in, the courts. In such cases the rule is properly laid down by the appellate court of Illinois in Burk v. Dunn, 55 Ill. App. 25, as follows:

"When the damages are considerable, are not capable of exact ascertainment, and rest mainly in estimation, and are based upon matters which are more or less uncertain, and where there is no fraud in procuring the contract, the amount fixed by the parties ought to be the guide for the court."

But we know of no cases recognizing an exception to the rule laid down as above in Parsons and in Bagley v. Peddie and Trower v. Elder, where there are various stipulations, under some of which the damages could be readily estimated, and others not, and where the provision for damages, as in the case at bar, applies to all alike. There can be no doubt, if the provision for damages had by agreement of parties been made to apply only to a main breach on the part of the plaintiff below in not erecting and completing the plant by a day certain, the damages for such a breach being entirely uncertain and speculative in character, that the provision would properly be con- strued as one for stipulated damages.

The counsel for plaintiff in error has, in his reply brief, contended for an exception to the rule he thinks applicable to the case, and for authority quotes from 1 Suth. Dam. § 294, as follows:

"Where an agreement contains several stipulations, differing in importance, and a sum is mentioned as liquidated damages to be paid in case of a breach, and of such amount as is apparently appropriate to a total breach, it will be intended to fix the damages only for such a breach; and an intention will not

be imputed to make it payable for breach of minor and unimportant parts, in the absence of language very clearly expressing it."

But, upon examination of this statement in Sutherland, we find it wholly unsupported by any authority. The only case cited by him is Hoagland v. Segur, 38 N. J. Law, 230, which does not hold to such a doctrine. On the contrary, the general rule of the English and American cases, as above given, is distinctly affirmed and followed in that case. The court even lays down the rule quite as strongly as the general line of cases would warrant, where it says:

"While the courts have allowed parties to adjust in advance, and stipulate for damages to be awarded in certain cases for the nonperformance of agreements of this kind, they have adopted certain rules of construction for determining where such an adjustment has taken place. The general rule is that where the agreement contains disconnected stipulations, of various degrees of importance, the sum named will be considered as a penalty, though it is called 'liquidated damages,' unless the agreement specify the particular stipulation or stipulations to which the liquidated damages are to be conferred. As was said by Lord Coleridge in Magee v. Lavell, L. R. 9 C. P. 115, the courts refuse to hold themselves bound by the mere use of the words 'liquidated damages,' and will look at what was considered, in reason, to have been intended by parties in relation to the subject-matter. The intention must be derived from the whole agreement, and, if it be doubtful upon the whole agreement whether the sum named was intended to be a penalty or liquidated damages, it will be construed to be a penalty."

This doctrine was applied by the New Jersey court to the case then in hand, and the provision in question, so far as it affected the breach, held in that case to be a penalty. It was as though the defendant in this case had sued to recover $50,000 as stipulated damages for a breach of the covenant to keep the buildings insured, or that to keep 300 men in its employ. It was not reasonable to suppose that the parties intended to have the provision for the payment of so large a sum as stipulated damages to apply to a covenant which prevented the defendant from receiving money on deposit, which was a minor stipulation of the contract, and held to be included in and part of the banking business. In that case, upon the sale of a banking house by the defendant, it was provided that defendant, after allowing a reasonable time to close out his business of banking, should not engage in the business again for 10 years, nor receive money on deposit. And it was stipulated that, if he did continue in the business contrary to the agreement, he should pay $10,000 as stipulated damages. He was sued for receiving money on deposit, and it was claimed that the $10,000 provision related to that stipulation. But the court held that receiving deposits was a necessary part of the banking business, which defendant had the right to carry on for a reasonable time until he could close out the business, and that by a true construction of the contract the provision for paying $10,000 as damages only applied to the stipulation against continuing in the banking business, and did not apply to the subordinate provision against receiving money on deposit. And in discussing that question the court used this language, which is Mr. Sutherland's only excuse for the principle he has laid down:

"In every case the parties to such an arrangement are in fact controlled, in fixing the sum which shall be compensation for nonperformance, by the im-

portance of the main object and purpose of the agreement, without regard to minor details. An intention to make the sum so determined on payable on the breach of minor and unimportant parts of the agreement will not be imputed, in the absence of language declaring such intention with precision."

The case is not by any means an authority favorable to the contention of the plaintiff in error. The judgment of the circuit court is affirmed.