## CHICAGO HOUSE-WRECKING CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. February 12, 1901.)

### No. 643.

BONDS—CONSTRUCTION—PENALTY OR LIQUIDATED DAMAGES—SUIT BY UNITED STATES.

    The principal defendant contracted with the United States for the tearing down and removal of a public building, and, with its co-defendants, executed a bond conditioned that it should be void if the work should be completed in accordance with the contract by April 1, 1897, but by which they bound themselves in the sum of $20,000, "computed and agreed upon by and between the United States of America and ourselves as liquidated damages, and not as a penalty, to be immediately due to the United States of America on the 1st day of April, 1897." *Held*, that notwithstanding the language of the bond the sum therein named must be construed as a penalty to secure the performance of the contract, and not as liquidated damages, since under the latter construction the same amount would be recoverable although the delay in completing the work might be very short, and the damages slight and easily ascertainable, which would be contrary to the plain principles of equity and fair dealing, and that both under the rule of the modern decisions, and Rev. St. § 961, which provides that in all suits brought to recover the forfeiture annexed to any bond, where the forfeiture, breach, or nonperformance appears by the default or confession of the defendant, "the court shall render judgment for the plaintiff to recover so much as is due according to equity," the noncompletion of the work by April 1st being admitted, the government could not recover without proof of actual damages, and defendants were entitled to prove in defense any matters which would in equity constitute a reasonable excuse for the delay.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

The facts in this case are very fully and fairly stated in the brief of counsel for plaintiffs in error as follows:

On the 5th day of August, 1897, the defendant in error instituted an action in debt in the circuit court of the United States for the Northern district of Illinois against the plaintiffs in error herein on a bond executed by them to the defendant in error for $20,000, and dated the 28th day of December, A. D. 1896, and conditioned that if the plaintiff in error the "Chicago House Wrecking Company shall by the first day of April, 1897, complete in each and every

particular the work contemplated by the contract dated May 26, 1896, and do and perform each and all of the covenants therein stipulated by said company to be kept and performed, then this obligation to be void; otherwise, to be and remain in full force and virtue." There was a further recital in the bond that the plaintiffs in error "and their sureties are held and firmly bound unto the United States of America in the sum of $20,000, lawful money of the United States of America, computed and agreed upon by and between the United States of America and ourselves as liquidated damages, and not as a penalty, to be immediately due to the United States of America on the 1st day of April, 1897." The history of this bond is as follows: On the 28th day of April, 1896, defendant in error invited proposals for the purchase and removal of the old United States Custom-House and Subtreasury building at Chicago. Each bidder was notified that "a copy of the advertisement, general instructions, and conditions, specifications, accepted proposals, and letter of acceptance of proposal will be attached to and form a part of the formal bond and contract to be executed and approved." The Chicago House-Wrecking Company, one of the plaintiffs in error, became the successful bidder, and on the 26th day of May, 1896, entered into a formal contract for the purchase of the building and its demolition and removal. The obligations of the contract on the part of the Chicago House-Wrecking Company were as follows: "That the party of the second part covenants and agrees to and with the party of the first part to purchase the United States Custom-House and Subtreasury building in the city of Chicago, county of Cook and state of Illinois, including extension, heating apparatus, elevators, sidewalk flagging, lot and area coping, drainage, water, gas, and other piping," etc., and to remove the same from the premises, with all concrete foundations, foundation walls, coal vaults, etc., and all débris, etc., and to leave the site clean, in strict and full accordance with the specification for the work, the advertisement for proposals, dated April 28, 1896, general instructions and conditions, the proposal dated May 16, 1896, addressed to William Martin Aiken, supervising architect, by said party of the second part, and letter dated May 26, 1896, addressed to said party of the second part by C. D. Hamlin, acting secretary of the treasury, accepting said proposal, "a true and correct copy of each of which said papers is attached hereto, and is hereby made a part of this contract." "The party of the second part further covenants and agrees * * * that the entire work shall be completed to the full satisfaction of the said party of the first part within five (5) months from the date of the approval by the secretary of the treasury of the formal bond hereto attached." This formal bond, which was for $10,000, but which was not used on the trial of this case, was approved by the then acting secretary of the treasury on the 13th day of June, 1896. Upon the approval of the contract and bond by the acting secretary of the treasury, plaintiff in error the Chicago House-Wrecking Company began the work of demolition and removal of the building, and had gotten down to and into the walls of the first story when it became evident that they could not complete the work within the time stipulated in the contract. An extension of time was asked by plaintiffs in error, and granted by the department, until the 1st day of April, 1897; and on the 28th day of December, 1896, plaintiffs in error, in compliance with the terms of said extension of time to April 1, 1897, executed the bond on which this action is brought. At the time of giving this bond the work of removal had not reached the cement bed or foundation upon which the building rested, and plaintiffs in error had no knowledge of its actual thickness, except as they had been told by defendant in error in the general instructions and conditions which had been promulgated by the department for the use and guidance of bidders in making their proposals, and afterwards made a part of the contract. These general instructions and conditions, under the head "Foundations," stated as follows: "The building rests on a continuous mass or slab of concrete, covering the whole area of building, and varying from 3' 6" to 4' 6" thick. The space between the top of said slab and under side of basement floor was also filled with concrete. Louisville and White Creek cement was used for this concrete." These general instructions and conditions contained other provisions. Under the subject "Requirements," it was stated: "Before submitting a proposal, each bidder should make careful examination of the specification and of the building, and fully

inform himself as to quantity and quality of the materials, and the work to be performed. And, should his proposal be accepted, he will be responsible for any and every error in his proposal resulting from his failure so to do." Under the subject "Examining Building," it was stated: "Parties intending to submit bids must apply to the custodian of the building for permission to examine the same, and for such other information as may be desired, and in making said examination must conform to the directions of the custodian."

On February 24, 1898, plaintiffs in error filed a plea confessing a breach of the bond, in that the work was not fully completed before the 1st day of April, 1897, and setting up in avoidance thereof the great thickness of the concrete foundations in excess of the thickness as given in the general instructions and conditions. On April 10, 1899, plaintiffs in error filed seven other pleas, to the following effect, namely: The first plea being the same as the plea filed February 24, 1898, except confessing in more precise language the failure to complete the work entire by April 1, 1897. The second plea confessing the breach, and setting up in avoidance thereof the making of test borings in the concrete foundation wherever it was possible to do so, and wherever not occupied by machinery, pillars, boilers, etc., and that this extra thickness was subsequently discovered in those inaccessible parts. The third plea confessing the breach, and setting up a delay of 30 days in the completion of the work by reason of the supervising architect withholding permission for that length of time to the wrecking company to remove the granite flagging and sidewalk as provided in the contract. The fourth plea, confessing the breach, and alleging that the agents and officers of defendant in error exercising control and direction over the work aided and assisted the officers of the city in retarding the progress of the work. The fifth plea confessing the breach, and alleging that, because of the extra thickness of the concrete foundation, it was necessary to do blasting, and that the work was delayed in its completion because the city authorities of the city of Chicago delayed the giving of authority to make such blasting. The sixth plea confessing the breach, and setting up a claim in the nature of set-off against defendant in error in the sum of $16,958, being the cost of removing this extra thickness in the concrete foundation in excess of the thickness given in the general instructions attached to and made a part of the contract. The seventh plea confessing the breach, and setting up the request of the defendant in error that the sidewalk flagging be left on the ground, to be used in the new building. On May 23, 1899, an amendment was filed to the fourth plea, alleging that after waiting a reasonable time for permission from the supervising architect to remove the granite flagging and sidewalk, and not having received same, they proceeded to remove the same, and were hindered by the officers and servants of defendant in error in doing so; also an additional plea setting up a set-off for $10,000 expended in removing the additional thickness of concrete subsequently discovered.

Upon the trial of the case, plaintiffs in error, in open court and to the jury, admitted the breach of the bond, in that they did not complete the demolition and removal of the building in question by the 1st day of April, 1897, and moved the court that, having admitted the issues, the burden of proof be adjudged to be on them, and they be entitled to open and close the case in the introduction of testimony and argument to the jury. The motion was refused, and an exception taken by the plaintiff in error. Counsel for defendant in error then introduced in evidence the bond sued on, the original contract marked "Plaintiff's Exhibit B," together with the exhibits attached thereto, one of which was the general instructions and conditions. Here counsel for the plaintiff (defendant in error) stated to the court that if it is admitted that the work was not completed according to contract on the 1st day of April, 1897, the plaintiff would not call any witnesses and would close its case, and thereupon it was admitted in open court by counsel for the defendant (here plaintiffs in error) that the contract referred to in the bond sued on in this case was not completed on the 1st day of April, 1897, as required by the contract, and that this admission should be taken as evidence and proof of that fact. This concluded the testimony on the part of the plaintiff. Thereupon plaintiffs in error tendered witnesses and offered proof of the various pleas set up in their answer, which testimony was excluded by the court on objec-

tion by counsel for defendant in error, and exception was taken to the court's ruling. Counsel for plaintiff in error also offered to show by the witnesses that the wrecking company, having obtained the extension of time and given the bond required therefor, continued to prosecute the work of removal of the building and the performance of the various items in connection therewith enumerated in the contract; that after a time the walls of the building were removed, and the work of blasting and removing the concrete foundation was begun; that it was then discovered for the first time that the concrete mass or slab under the outer walls and inner walls and pillars, and under that portion occupied by the electric light plant, the boiler and engine room, and other places occupied by heavy machinery, had a thickness of from seven to twelve feet, and contained an excess of about fourteen thousand five hundred cubic yards over what would be contained in the dimensions furnished by the government under the subject "Foundations." This testimony was likewise excluded by the court, and exceptions taken. It was further offered to be proven that the wrecking company continued to prosecute the work of its removal, notwithstanding the fact that it was apparent the work could not be completed within the period of the extension; that after April 1, 1897, which was the expiration of the extension period, the wrecking company continued the work of removal with the full knowledge and acquiescence of the government, and completed the work about the 14th day of June, 1897; that the quantity of extra material so removed from this cement foundation was about 15,500 cubic yards, and the extra cost of its removal was about $16,500; that during all of this time, from the 1st day of April until the 14th day of June, the government permitted the wrecking company to go on expending large sums of money to remove this extra concrete and finish the work, accepted the results, and received the benefits thereof. This offer the court also excluded upon objection by counsel for defendant in error, and exceptions were duly taken. Testimony was also offered to show that, but for this extra thickness in the concrete foundation, the work would have been completed by April 1, 1897; but this, too, was excluded. It was further offered to be shown by the witness James C. Rankin, who was the supervising architect for the United States government in the original erection and construction of this building in the years 1868, 1869, 1870, and 1871, that the original plans and specifications of this building contemplated making the concrete foundations about four feet thick, but that various local conditions necessitated making it much thicker. The same testimony was offered by the witness Garnsey, an architect who was associated with the architect Rankin in the erection of the building; also that the concrete under the columns and outer walls was in excess of seven feet in thickness; that later on concrete pieces, or buttresses, were put down on the outside of the walls to strengthen them; that these pieces were put down twelve feet below the surface in many places, and the thickness of the concrete under the outer walls and pillars was as much as nine feet in thickness. All of which testimony the court excluded. The court also refused to permit plaintiffs in error to show that they were delayed in the completion of the work by reason of the conduct of the city authorities in withholding permission to do the necessary blasting to remove the concrete foundation, and that they were also delayed by the officers and agents of the government, who refused them permission to remove the granite·flagging and sidewalk at the proper time in the progress of the work. All the rulings of the court were made upon the theory that the bond sued upon was a bond for liquidated damages, and that the amount thereof became due as a debt upon the failure to fully complete the work by April 1, 1897. The action was defended on the theory that the bond, notwithstanding the recitals on its face, was in fact and in law a penal bond, and that, under section 961 of the Revised Statutes of the United States, the recovery must be limited to such sum "as is due according to equity." The court said: "It is a matter of law here. I passed upon all the points you suggested. There is no use wasting any more time,"—and, after refusing the instructions requested by plaintiffs in error, directed the jury to find against them "for the total sum of twenty thousand dollars," and "to assess the damages at the sum of twenty thousand dollars," which was accordingly done; and the court, after overruling a motion for a new trial, entered judgment upon the verdict.

Charles H. Aldrich and John B. Brady, for plaintiff in error.

S. H. Bethea, for the United States.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

Upon the foregoing statement of facts, BUNN, District Judge, delivered the opinion of the court.

We think it was error to direct a verdict for the full amount of $20,000, the amount named in the bond, without requiring evidence of actual damages sustained. Such a claim would seem to savor more of the pound of flesh and "due and forfeit of my bond" rule than of the spirit of modern equity. Unless it be clear that the case is one where it would be difficult or impossible to assess the actual damages from testimony given, the court should construe the amount named in the bond or contract as a penalty, although the parties have chosen to call it "stipulated damages." It is a general rule that, where the contract provides for the payment of a large sum of money upon the failure of the party to pay a smaller sum, the amount named as damages will be construed as a penalty, although called "stipulated damages." This is not because the contract to pay money is essentially different from a contract to perform work or labor or to do any other thing, but because the actual damages are capable of assessment; and the rule is just the same in all cases where the actual damages can be assessed from testimony. The parties cannot, by calling the sum mentioned "stipulated damages," change what is essentially a penalty intended to secure the performance of the contract into damages, to take the place of the damages actually sustained. The Revised Statutes of the United States (section 961) provide:

"In all suits brought to recover the forfeiture annexed to any articles of agreement, covenant, bond, or other specialty, where the forfeiture, breach or non-performance appears by the default or confession of the defendant or upon demurrer, the court shall render judgment for the plaintiff to recover so much as is due according to equity. And when the sum for which judgment should be rendered is uncertain, it shall, if either of the parties request it, be assessed by a jury."

This rule congress has provided for the guidance of the federal courts in all cases where it is applicable. It is just, benign, and equitable, while the rule which the court has applied in the case at bar seems harsh, inequitable, and quite unnecessary. Aside from the above statute, which defines the attitude of the government towards these cases, and prescribes the rule it is willing to abide by, we think, under the more recent adjudications of the courts, both in this country and in England, the $20,000 mentioned in the bond in this case should be construed as a penalty, rather than as stipulated damages to be recovered upon any slight breach of the contract, when nominal damages or small actual damages to be assessed by the jury would satisfy the conditions more justly and equitably. If the parties could at will change what is essentially a penalty, and properly intended to enforce the obligations of the contract, into stipulated damages, it could be done in any case, although the dam-

ages might be either nominal or easily assessable. Take the case at bar. When found that the work of removal could not be completed by the time named, the parties entered into an agreement extending the time several months, to April 1st. At the time of giving the bond in suit, and when the time was thus extended, the work of removal had not reached the cement bed or foundation upon which the whole building rested, and which has been the prime obstacle to the performance of the job. When this cement foundation was reached it was found, or at least it was so alleged, to be much thicker,—more than twice as thick in places as the government proposals and schedules had given out. This, it was claimed, caused great delay and an extra expense of some $16,500. Can it be just, or really supposed to have entered into the contemplation of the parties, that under such circumstances, arising, probably, without any expectation or anticipation of either party, if the completion of the work was delayed for a single hour or day beyond the 1st of April, that the wrecking company should pay the sum of $20,000? Or if the work were completed by the time named, except a few yards of excavation in the cement foundation, or the clearing away of a little rubbish, which could be accomplished in a few hours or days, and the expense easily estimated, that the like punishment should follow? Such a rule, if supported by law, certainly does not seem to comport with the more benign and beneficent rule of the statute above quoted, or the plain principles of equity and fair dealing. According to the construction placed upon the contract, the same measure of damages would apply if the wrecking company required one day or six months beyond the time fixed to complete the work. Such considerations, we think, go to show that the amount named should be construed as a penalty. There is no complaint that the wrecking company did not complete the job. The only complaint is that it ran a little beyond the time fixed. Saying nothing about the claimed right of the company to recover of the government the extra expense of $16,500 incurred in the removal of the cement foundation, is there anything unreasonable in the claim, in case it be true that there was this difference between the actual facts in regard to the thickness of the cement and the representations in the government schedules upon which the bid was made, that this would form a reasonable excuse for not completing the work by the very day named in the contract? Or suppose it be true, as claimed, that the company was hindered and delayed in the work by the action of the government officers having the matter in charge; is there anything unreasonable in the claim that this would form a good excuse for delay? A similar question has recently twice been before this court, particularly in East Moline Co. v. Weir Plow Co., 37 C. C. A. 62, 95 Fed. 250, where the question was gone into more or less exhaustively, and the decisions reviewed. That case grew out of a contract for the removal of the plow company's factory from Monmouth, Ill., to a point near Port Byron Junction, where the plaintiff company owned real estate it desired to enhance in value and to place upon the market. The contract contained various stipulations of varying degrees of importance, with this provision as to damages:

"It is hereby mutually agreed by and between the parties hereto that the measure of damages for the default of either party to carry out its agreement shall be $50,000, less such sums as may have been paid by either party to the other."

. The plaintiff sought to recover the $50,000 as stipulated damages, and the defendant made the same claim against the plaintiff, by way of counterclaim. No proof of damages was offered by either party, and the court held that neither party could recover the $50,000, which the court construed as a penalty. The opinion in that case will obviate the necessity of any very extended review of the authorities in the case at bar. Still, a brief reference to some of the leading adjudications contained in the brief for plaintiff in error may not be inappropriate.

In Manufacturing Co. v. Camp, 13 C. C. A. 137, 65 Fed. 794, 25 U. S. App. 134, it was provided in the contract that:

"The sum of $5,000 is now hereby estimated, assessed, and accepted between the parties hereto as liquidated damages to be paid by the parties of the second part unto the party of the first part, which the parties of the second part hereby declare to be due, and promise and bind themselves to pay unto said party of the first part, or to its assigns, immediately upon the termination or annulment, or declaration of the termination or annulment, of this contract by the party of the first part for any of the causes or reasons herein set out."

Upon this clause in the contract the court say:

"Is this sum of $5,000 inserted as a penalty or as liquidated damages? 'Upon this subject,' says Judge Deady in Harris v. Miller, 6 Sawy. 319, 11 Fed. 118, 'the law is peculiar, and, instead of giving effect to the contract of the parties according to their intentions, it assumes to control them according to its standard of justice.' In a note to Spencer v. Tilden, 5 Cow. 144, it is said: 'This doctrine which converts damages apparently stipulated or fixed by the parties into a penalty came from the civil law through the court of chancery, and has at length obtained a firm hold in the courts of common law. It is obvious that, in order to enforce it, courts must disregard the particular expressions of the parties; for the moment we agree that a party may, by calling a real penalty "liquidated damages," or throwing it into the form of an alternative in a contract, or substituting its payment for some specified default, secure the whole to himself, without regard to the real damages, we bring back the oppressive rule of the common law. The griping creditor will always use the particular form or phraseology of contract which will secure him his pound of flesh unless the courts interfere in all cases, and tell him that, from the very nature and essence of his bond, whatever he claims, and in whatever shape, or upon whatever footing, if it be in truth plainly beyond the legal amount of damages, so far it shall be no more than nominal.' The rule laid down in Barton v. Glover, Holt, N. P. 43, 45, is: 'Where a sum of money, whether in the name of a penalty or otherwise, is introduced in a covenant or agreement merely to secure the enjoyment of a collateral object, the enjoyment of the object is considered as the principal intent of the deed or contract, and the penalty only as accessory, and therefore only to secure the damage really incurred.' The fact that the parties speak of it as 'liquidated damages' is not conclusive [citing Lampman v. Cochran, 16 N. Y. 275]. * * * 'The subject-matter of the contract and the intention of the parties are the controlling guides. If, from the nature of the agreement, it is clear that any attempt to get at the actual damages would be difficult, if not vain, then the courts will incline to give the relief which the parties have agreed on. But if, on the other hand, the contract is such that the strict construction of the phraseology would work absurdity or oppression, the use of the term "liquidated damages" will not prevent the courts from inquiring into the actual injury sustained, and doing justice between the parties.' Sedg. Meas. Dam. (7th Ed.) 399; Pom. Eq. Jur. § 433."

In the case of Bignall v. Gould, 119 U. S. 495, 7 Sup. Ct. 294, 30 L. Ed. 491, the language of the bond sued upon was, "in the penal sum of $10,000, liquidated damages." Justice Gray, in delivering the opinion of the court, said:

"By the rules now established, at law as well as in equity, the sum of $10,-000, named in this bond, is a penalty only, and not liquidated damages. As observed by Lord Tenterden in a similar case, 'Whoever framed this agreement does not appear to have had any very clear idea of the distinction between a penalty and liquidated damages, for the sum in question is described in the same sentence as a penal sum and as liquidated damages.' Davies v. Penton, 6. Barn. & C. 216, 222, 9 Dow. & Ry. 369, 376."

The subject of liquidated damages is fully and exhaustively considered, and what we consider the true rule laid down, in 19 Cent. Law J. 284, as follows:

"But if the court, after a thorough inspection of the contract in all its provisions, and consideration of its subject-matter, and all its surrounding circumstances, the ease or difficulty of measuring the breach in damages, the situation of the parties, and the usages to which they may be understood to refer, from the whole, decide that equity and good conscience require that such sum be treated, not as liquidated damages, but as a penalty provided to secure the due performance of the act, and therefore subject to the chancery powers of equity courts, or the statutory powers of common-law courts, they will betray no hesitation in doing so,"—citing Peine v. Weber, 47 Ill. 43; Low v. Nolte, 16 Ill. 475, 477; Hahn v. Hortman, 12 Bush, 249; Foley v. McKeegan, 4 Iowa, 1; Williams v. Green, 14 Ark. 315, 321; Dwinel v. Brown, 54 Me. 468, 471; Bearden v. Smith, 11 Rich. Law, 554, 556; Grasselli v. Lowden, 11 Ohio St. 349, 361; Reynolds v. Bridge, 6 El. & Bl. 545; McPhee v. Wilson, 25 U. C. Q. B. 169, 172; Magee v. Lavell, L. R. 9 C. P. 107, 115; Beale v. Hayes, 5 Sandf. 640; Hoag v. McGinnis, 22 Wend. 163, 165; Gillis v. Hall, 7 Phila. 422, 2 Brewst. 342; Perkins v. Lyman, 11 Mass. 76, 81; Hodges v. King, 7 Metc. (Mass.) 583; Dakin v. Williams, 22 Wend. 201; Chamberlain v. Bagley, 11 N. H. 234; Hosmer v. True, 19 Barb. 106; Streeper v. Williams, 48 Pa. St. 450; Curry v. Larer, 7 Pa. St. 470; Cushing v. Drew, 97 Mass. 445; Lindsay v. Anesley, 6 Ired. Law, 186; Foley v. McKeegan, 4 Iowa, 1; Hamaker v. Shroers, 49 Mo. 406; Dwinel v. Brown, 54 Me. 468, 471; Hise v. Foster, 17 Iowa, 23; Bigony v. Tyson, 75 Pa. St. 157; Grasselli v. Lowden, 11 Ohio St. 349, 351; Colwell v. Foulks, 36 How. Prac. 306, 320; Fisk v. Gray, 11 Allen, 132; Wallis v. Carpenter, 13 Allen, 19; Lord v. Gaddis, 9 Iowa, 265.

Again, the author says:

"The leading case upon the second branch of the rule just stated is Kemble v. Farren, 6 Bing. 141. Though it has been questioned and repudiated by some courts as an attempt to make a contract for the parties in derogation of their own, as an unjustifiable interference with the freedom of action of competent persons, it has withstood all hostile criticism, and the array of cases which have cited it with approval and followed it is a standing voucher for the logic of its decision. An actor made a contract not to play for five seasons with any one but the obligee, and the latter promised to pay the former £3. 10s. each night, and some small expenses in addition. The bond provided that, if either party should violate any of such promises, he should forfeit to the other the sum of £1,000, not by way of penalty, but as and by way of liquidated damages. As a strict adherence to this language would have made the employer liable in the sum of £1,000 for a neglect to pay one single night's stipend, viz. £3. 10s., the damages for the nonpayment of which would be too slight for notice, and as there was nothing to indicate that this result was to be excluded, but, on the other hand, the clause covered violations of any and all stipulations, the court came to the conclusion that the intention of the parties, which is the 'pole star' in the construction of all compacts, was not to effect so absurd a result, but merely to provide a penalty as security for the due per-

formance of the various stipulations, and that the words employed were either inserted by mistake, or for purposes of deception and to evade the well-known policy of the law."

In Wilhelm v. Eaves (Or.) 27 Pac. 1053, 14 L. R. A. 297, there was up for construction a stipulation for the payment of $200 "as liquidated damages on the breach of any of several promises or agreements which were of varying degrees of importance." The court, in an exhaustive opinion holding this to be penalty, and not for liquidated damages, says:

"The decision of the question as to whether a given sum, provided in the contract to be paid on a breach thereof, shall be considered as liquidated damages or a penalty, is often inherently difficult, and there is much apparent conflict in the adjudged cases. The words 'liquidated damages' are not at all conclusive as to the character of the stipulation. Compensation for a breach of a contract is always desirable, and the courts are not bound by the language used by the parties; and, if the construction is at all doubtful, the tendency of the courts is in favor of the interpretation which makes the sum a penalty. Cushing v. Drew, 97 Mass. 445. While it is usually said that the intention of the parties, as gathered from the subject-matter of the contract, the language used, and surrounding circumstances, is to govern in cases of this kind, 'such intention,' says Mr. Sutherland, 'under the artificial rules that have been adopted, is determined by very latitudinary construction. To be potential and controlling that a stated sum is liquidated damages, that sum must be fixed as the basis of compensation, and substantially limited to it, for just compensation is recognized as the universal measure of damages not punitory. Parties may liquidate the amount by previous agreement, but, where a stipulated sum is evidently not based on that principle, the intention to liquidate damages will either be found not to exist, or will be disregarded, and the stated sum treated as a penalty.' 1 Suth. Meas. Dam. 480. In Jaquith v. Hudson, 5 Mich. 123, the court says: 'The law, following the dictates of equity and natural justice in cases of this kind, adopts the principle of just compensation for the loss or injury actually sustained, considering it no greater violation of this principle to confine the injured party to the recovery of less than to enable him, by the aid of a court, to extort more. * * * This principle of natural justice, the courts of law, following courts of equity, have, in this class of cases, adopted as the law of the contract; and they will not permit the parties, by express stipulation, or any form of language, however clear the intent, to set it aside.' From the confused array of individual cases upon this question there may be deduced certain general rules that are recognized and enforced by the courts, and the apparent conflict in the cases arises rather from the application of these rules to the facts of the individual case than in the principles themselves. One of these rules is that when a contract specifying one certain sum as liquidated damages contains various stipulations of different degrees of importance, and the damages from a breach of some of which would be easily ascertainable, though the remainder might belong to that class which justifies such arrangement as to damages, and by the terms of the contract such sum would be payable equally on the failure to perform the least as to that to perform the most important, or equally on the failure to perform that one the damage from the violation of which would be easily ascertainable as to that from the breach of which the loss would be difficult of ascertainment, the stipulated sum will be regarded as a penalty, and not liquidated damages, though the language of the parties be the strongest which could be employed to evince a contrary intent,"—citing Kemble v. Farren. 6 Bing. 141; Carter v. Strom, 41 Minn. 522, 43 N. W. 394; Lampman v. Cochran, 16 N. Y. 275; Daily v. Litchfield, 10 Mich. 29; Cheddick's Ex'r v. Marsh, 21 N. J. Law, 463; Trower v. Elder, 77 Ill. 452; Lyman v. Babcock, 40 Wis. 503; Niver v. Rossman, 18 Barb. 50; 3 Pars. Cont. 161; 2 Pom. Eq. Jur. § 443; 1 Suth. Meas. Dam. 521; 19 Cent. Law J. 282, where the authorities are fully collated.

In Beale v. Hayes, 5 Sandf. 640, Judge Duer, delivering the opinion of the court, says:

"It is not always, however, that damages are to be construed as liquidated because the parties have construed them to be so. The language of the parties to the agreement in question is clear and emphatic that the sum of $3,000 shall be recoverable from the party making default, as and for liquidated damages; yet no court of justice, without an entire disregard of prior decisions, can give effect to the apparent intentions of the parties by adopting that construction of their agreement which the terms they have used so forcibly suggest. * * * When consequences so unreasonable would follow, the law presumes that they must have been overlooked by the parties, and therefore mercifully gives to their language an interpretation which excludes them. When it would be plainly unconscientious to exact a large sum for a trivial breach, even a court of law, acting upon a principle of equity, will release the parties from the literal obligation which their language imports."

In Suth. Meas. Dam. p. 601, the author, in speaking of these building contracts, says:

"In a building contract containing the usual clauses fixing the days for completing the various parts of the work, a stipulation to the effect that any neglect to comply with the conditions of the contract and finish the work as provided should entitle the employer to claim damages at the rate of $10 per day for every day's detention so caused was held a covenant for stipulated damages. The more recent authorities, however, are to the effect that the damages ordinarily resulting from the failure to fulfill a building contract which contains only the usual conditions are not so uncertain as to be the subjects for such stipulations."

One of the leading English cases upon this subject is that of In re Newman, Ex parte Capper, 4 Ch. Div. 724. The case grew out of a contract for the erection of certain buildings, which provided that they should be completed by the 25th day of December, 1875; the language of the contract on this point being:

"The said works to be finished, completed, and delivered up, cleared of all scaffolding, rubbish, and other impediments, on or before the 25th of December, 1875, and in default thereof the said contractor shall forfeit and pay to the said governors the sum of £10 per week for every week after that date during which the said work shall remain unfinished and not delivered up."

The works were commenced by the contractors, and were carried on by them until the 5th of November, 1875, when they failed. On the 3d of February following, the governors entered into a contract with the sureties of the contractors for the completion of the buildings on their own account, which contract contained a stipulation that nothing therein contained should prejudice the remedy of the governors under the prior agreement and bond. The works were ultimately completed by the sureties, but not until September, 1876. In February, 1876, the governors tendered proof against the estate of the contractors for the sum of £1000 as liquidated damages for the breach of the contract. The affidavit of proof made did not allege any particular damage, and the trustees rejected the claim against the estate on the ground that it was not shown that any damage had been sustained by the nonperformance of the contract. Application being made by the governors of the county court, the judge affirmed the decision of the trustees on the ground that the final clause was

intended only to fix a penalty for the nonperformance of the contract. The governors appealed to the chief judge. Bacon, C. J., upon an appeal, reversed the judgment of the county court, saying:

"The provisions of this contract are so plain that, however it may have been in other cases which have been mentioned, it would be very difficult to give any other meaning to them than that which they bear on their face. * * * Here it was of the substance—the very essence—of the contract that the buildings should be completed by the 25th of December. In November the trustees had the option of saying that they would or would not complete the contract, and they went on with it up to a certain time, when they repudiated it. The meaning of the clause, if it means anything at all, is that the penalty of £1,000 has been incurred. I cannot alter the contract. I cannot find any circumstances to induce me to say, or to justify me in saying, that in the events which have happened a less sum than £1,000 should be paid. If I were to say that, I should be obliged to ask myself how much less than £1,000 ought to be paid. What means have I of ascertaining that? It has not been suggested that there are any particulars of the amount of damage which has been incurred, and I do not know that anybody is in a position to furnish them. But I say that, if the contention of the trustees were right, I should be puzzled greatly in either finding, or directing any other tribunal to find, the amount of the specific damage which has been sustained. The order is wrong, and the appeal must succeed. The appellants must have their costs of the hearing in the court below and of the appeal."

From this decision the trustees appealed. Upon this final appeal the opinion of Chief Justice Bacon was reversed by the concurring opinions of all the justices, from which we quote as follows:

"James, L. J. I am of opinion that this case is clearly within those which have been referred to by Mr. Bagshawe. The authority of Kemble v. Farren cannot be considered as having been in any degree nibbled away by those cases before Lord Wensleydale which have been referred to, and which it is said show that the principle of Kemble v. Farren is to be confined to a case in which, amongst other stipulations, there was one stipulation for the payment of a sum of money. That was not the ratio decidendi of Kemble v. Farren, in which it was laid down in broad terms that, 'wherever there is a sum mentioned at the end of a contract as damages for the nonperformance of any of a great number of stipulations, there it must be treated as a penalty.' The law is, I think, stated in a very satisfactory way in a case which was referred to in the argument of Kemble v. Farren. I mean Astley v. Weldon, 2 Bos. & P. 346, in which Mr. Justice Heath said: 'Where articles contain covenants for the performance of several things, and then one large sum is stated at the end to be paid upon breach of performance, that must be considered as a penalty. But where it is agreed that, if a party do such a particular thing, such a sum shall be paid by him, there the sum stated may be treated as liquidated damages.' "

"Baggallay, J. A. I am of the same opinion. I will only add that the principle upon which Kemble v. Farren was decided was commented upon by Lord Westbury in the case of Thompson v. Hudson, L. R. 4 H. L. 1, in these terms: 'If the sum described as liquidated damages be a large sum, and the title to that sum is to arise upon some very trifling consideration, then it follows plainly that the large sum named never could have been meant to be the real measure of damages. It was an oppressive agreement. The sum named never could have been the proper amount of damages arising upon the nonobservance of some of the stipulations of that agreement, which probably would have been measured by a few shillings, and therefore the very large sum stated to be damages was properly regarded as in the nature of a penalty.' If further authority is wanted for the decision at which we have arrived in this case, I think it is found in the words used by Lord Coleridge in Magee v. Lavell, L. R. 9 C. P. 107, which appear exactly applicable to the present case."

Bramwell, J. A., says:

"I am entirely of the same opinion. I do not wish to quote anything I have said as an authority, and I do not wish to repeat it. Therefore, instead of repeating it, I will simply say that I abide by everything I said in Betts v. Burch, 4 Hurl. & N. 506. It has been argued that in Galsworthy v. Strutt, 1 Exch. 659, and the other cases referred to by Mr. De Gex, we have the authority of Lord Wensleydale that this £1,000 can be proved against the debtor's estate. If it were a question of bare authority, independently of principle, I should say that we have the rule laid down by Lord Coleridge in Magee v. Lavell, L. R. 9 C. P. 107, expressly to the contrary, where he says: 'If we look to the nature of the contract in the present case, it will be seen that it involves several events of various degrees of importance; and therefore, according to the general principle governing such cases, the sum mentioned must be considered as a penalty, and not liquidated damages.' I am of the opinion that this appeal must be allowed. I may add that I cannot think there can be any difficulty in assessing the damages."

We are of opinion that the case at bar comes fairly within the spirit and meaning of these adjudications. The judgment of the circuit court is reversed, and the cause remanded, with instructions to grant a new trial.