NORTHWESTERN TERRA COTTA CO. v. CALDWELL et al.

(Circuit Court of Appeals, Eighth Circuit. June 19, 1916.)

No. 4521.

1. CONTRACTS ☞284(1)—BUILDING CONTRACT—SUBMISSION TO ARCHITECT—DECISION.

The fact that the architect for a courthouse would have decided that the coping should be of the same material as the lintels is not equivalent to the submission of the question to him and his actual decision upon it,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as called for by the contract between the general contractors and the contractor for the terra cotta work.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1303; Dec. Dig. ☞284(1).]

2. BONDS ☞135—ENFORCEMENT.

Bonds, other than penal, providing for a fixed liability upon condition, on breach thereof will be enforced, not according to their literal interpretation, but for the amount of actual damages,

[Ed. Notes.—For other cases, see Bonds, Cent. Dig. §§ 241, 243, 259; Dec. Dig. ☞135.]

3. MORTGAGES ☞137—ENFORCEMENT.

Mortgages, in form conveyances of property upon condition, are not enforced to the letter, but simply as security for the amount due.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 270–276; Dec. Dig. ☞137.]

4. DAMAGES ☞78(2)—LIQUIDATED DAMAGES—PENALTY.

The mere use of the terms "penalty," "forfeiture," "liquidated damages," or "stipulated damages" is not conclusive as to whether a contract provides for liquidated damages or a penalty.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 157; Dec. Dig. ☞78(2).]

5. COURTS ☞92—OPINION—GENERAL EXPRESSIONS—DICTA.

General expressions in every judicial opinion are to be taken in connection with the case in which they are used, and, if they go beyond, may be respected, but should not control the judgment in a subsequent suit when the very point is presented for decision.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 335; Dec. Dig. ☞92.]

6. SALES ☞55—CONSTRUCTION OF CONTRACTS—LAW GOVERNING.

A contract, expressly providing that it was not a building contract, but for the furnishing of materials to be used in performing a building contract, and that the same should be furnished and delivered f. o. b. the cars in Chicago, will be construed according to the laws of Illinois.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 2, 153; Dec. Dig. ☞55.]

7. COURTS ☞365—FEDERAL COURTS—FORCE OF STATE DECISIONS.

In construing a contract for the furnishing of building materials to general contractors for a courthouse, decisions of the state courts, though not conclusive, will be persuasive.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 950; Dec. Dig. ☞365.]

8. DAMAGES ☞78(7)—LIQUIDATED DAMAGES—PENALTY.

The provision that should the contract be uncompleted at a fixed date, the contractor should pay $50 liquidated damages for each day's delay, but should it be completed before such date, should receive $50 per day bonus, was not for liquidated damages, but for a penalty, in a contract to furnish, according to detailed plans, $13,000 worth of ornamental terra cotta which had to be manufactured specially for the purpose, to the general contractors for a courthouse.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 163; Dec. Dig. ☞78(7).]

9. CONTRACTS ☞294—CONTRACT TO FURNISH MATERIAL—SUBSTANTIAL COMPLIANCE.

Where a contractor to furnish terra cotta to the general contractors for a courthouse performed 99⅔ per cent. of the agreement, failing only to

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

furnish the lintels, as to which there was a dispute regarding the material, there was a substantial compliance with the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1352, 1357–1361; Dec. Dig. ☞294.]

Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Nebraska, Thos. C. Munger, Judge.

Suit by the Northwestern Terra Cotta Company against George W. Caldwell and others. To review a judgment for defendants, plaintiff brings error. Case reversed and remanded, with directions to set aside the verdict and grant new trial.

E. H. Scott, of Omaha, Neb. (L. F. Crofoot and W. C. Fraser, both of Omaha, Neb., on the brief), for plaintiff in error.

J. A. C. Kennedy, of Omaha, Neb. (T. J. Mahoney, of Omaha, Neb., on the brief), for defendants in error.

Before HOOK and SMITH, Circuit Judges, and REED, District Judge.

SMITH, Circuit Judge. George W. Caldwell and Lester Drake, as copartners under the name of Caldwell & Drake, entered into a contract for the construction of a new courthouse at Omaha, Neb., and gave a bond to the county dated April 10, 1909, with the Fidelity & Deposit Company of Maryland as surety which provided:

"Now the condition of this obligation is such that if the above bounden Caldwell & Drake shall pay off and discharge all debts due to subcontractors, laborers and mechanics and all debts of every nature due for labor and material used in and about said building in the performance of said contract * * * then the above obligation to be void, otherwise to be and remain in full force and effect."

The building was to be of stone, with certain terra cotta trimming, and Caldwell & Drake let the contract to furnish the terra cotta to plaintiff for $13,000, and the Fidelity & Deposit Company of Maryland signed as surety a separate bond to the Northwestern Terra Cotta Company for the payment of the amount of said contract by Caldwell & Drake. The contract between the plaintiff and the defendants Caldwell & Drake for the terra cotta work stipulated that the plaintiff should be designated as the contractor, and Caldwell & Drake should be designated as the owners and contained the following provisions:

"Article I. The contractors shall and will provide all the materials and perform all the work for the furnishing and delivering f. o. b. cars Chicago, with allowance of freight to Omaha, for the architectural terra cotta for the Douglas county courthouse to be erected at Omaha, Neb., as shown on the drawings and described in the specifications prepared by John Latenser, architect, which drawings and specifications become hereby a part of this contract.

"Art. II. It is understood and agreed by and between the parties hereto that the work included in this contract is to be done under the direction of the said architects and that their decision as to the true construction and meaning of the drawings and specifications shall be final. * * *

"Art. V. Should the contractors at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such re-

fusal, neglect or failure being certified by the architects, the owners shall be at liberty, after three weeks written notice to the contractors, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractors under this contract; and if the architects shall certify that such refusal, neglect or failure is sufficient ground for such action, the owners shall also be at liberty to terminate the employment of the contractors for the said work and to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor; and in case of such discontinuance of the employment of the contractors they shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owners in finishing the work, such excess shall be paid by the owners to the contractors; but if such expense shall exceed such unpaid balance, the contractors shall pay the difference to the owners. The expense incurred by the owners as herein provided, either for furnishing materials or for finishing the work, and any damage incurred through such default, shall be audited and certified by the architects whose certificate thereof shall be conclusive upon the parties.

"Art. VI. The contractors shall complete the several portions and the whole of the work comprehended in this agreement by and at the time or times hereinafter stated, to wit: They shall begin delivery on cars Chicago of the first material required for the building on or before October 10, 1910, and shall follow up with further shipments so as to complete the entire work on or before October 25, 1910.

"Should the contractor fail to complete said work by and at said time, he shall pay to the owner liquidated damages of fifty [—] ($50.00) for each and every day after October 25th, 1910, and the owner shall pay to the contractor a bonus of fifty dollars ($50.00) for each and every day the said work is completed prior to October 25th, 1910.

"Art. VII. Should the contractors be delayed in the prosecution or completion of the work by the act, neglect or default of the owners, of the architects, or of any other contractors employed by the owners upon the work, or by any damage caused by fire or other casualty for which the contractors are not responsible, or by combined action of workmen in no wise caused by or resulting from default or collusion on the part of the contractors, then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all the causes aforesaid, which extended period shall be determined and fixed by the architects; but no such allowance shall be made unless a claim therefor is presented in writing to the architects within forty eight hours of the occurrence of such delay.

"Art. VIII. The owners agree to provide all labor and materials essential to the conduct of this work not included in this contract in such manner as not to delay its progress, and in the event of failure so to do, thereby causing loss to the contractors, agree that they will reimburse the contractors for such loss; and the contractors agree that if they shall delay the progress of the work so as to cause loss for which the owners shall become liable, then they shall reimburse the owners for such loss.

"Should the owners and contractors fail to agree as to the amount of loss comprehended in this article, the determination of the amount shall be referred to arbitration as provided in article XII of this contract."

"Art. XII. In case the owners and contractors fail to agree in relation to matters of payment, allowances or loss referred to in Articles III or VIII of this contract, or should either of them dissent from the decision of the architects referred to in Article VII of this contract, which dissent shall have been filed in writing with the architects within ten days of the announcement of such decision, then the matter shall be referred to a board of arbitration to consist of one person selected by the owners, and one person selected by the contractors, these two to select a third. The decision of any two of this board shall be final and binding on both parties hereto. Each party hereto shall pay one-half of the expense of such reference."

The contract contained no special designation of the amount of terra cotta to be furnished except by reference to the plans and specifications. A controversy arose between Caldwell & Drake and the Northwestern Terra Cotta Company as to just what terra cotta was to be furnished under the contract. The parties agreed that it called for sufficient for the cornice below the coping, and Caldwell & Drake claimed it included the coping and certain lintels upon the tower. The Northwestern Terra Cotta Company claimed that neither the coping nor lintels was embraced in the contract. The property which both sides agreed was covered by the contract was all manufactured and ready to be shipped and cars ordered by October 25, 1910. Caldwell & Drake, after the making of the contract, requested that shipments be made over the Chicago Great Western Railroad. The Northwestern Terra Cotta factory was on the line of the Chicago & Northwestern Railway, and compliance with the request of Caldwell & Drake to ship over the Chicago Great Western caused the slight delay beyond the date mentioned in the contract. The shipments were in five cars, and were actually made, two cars on October 26th, one on October 27th, one on October 29th, and one on November 2d, and all reached Omaha before they were needed in the construction of the building. There was some confusion in the plans and specifications as to what material the coping and lintels were to be of. One of the plans, Exhibit 4, shows the lintels of brick and the coping of stone. Another of the plans, Exhibit 5, does the same. Another plan, Exhibit 6, shows the coping as terra cotta, but indicates nothing as to the lintels. A fourth plan, Exhibit 7, shows the lintels in terra cotta, and shows nothing as to the coping. It appears to be agreed that the question as to the lintels was submitted to the architect as provided in article II of the contract, and he held that they were of terra cotta, but permission was given to use stone, and by agreement of the parties stone was used by Caldwell & Drake. This was done at a cost of $41.06. No question was ever submitted to the architect, as provided in the contract, as to the coping, but he testified:

"I did not make a decision whether or not the coping should be of terra cotta or of stone, but if the matter had been presented to me, my position would have been the same as on the lintels."

The coping of the cornice was put on of stone at a cost of $294.10.

[1] The District Court decided the case entirely on the failure to furnish the lintels, and there seems to be no doubt this was correct, as the fact that the architect would have decided the question in a particular way is not equivalent to its submission to him and his actual decision upon the question. It is agreed that Caldwell & Drake were entitled to credit for cash paid either as freight or direct to the Northwestern Terra Cotta Company for $9,920.74. They were further entitled to credit for $7.20 for recutting some of the terra cotta. Stone cost more than terra cotta, but in the bill the Northwestern Terra Cotta Company gave Caldwell & Drake credit on account of the lintels for $50. This makes the total credit upon the purchase price of $13,000 amount to $9,977.94, and leaves a balance of $3,022.06, with interest according to the terms of the contract, due

the Northwestern Terra Cotta Company. Caldwell & Drake and the Fidelity & Deposit Company of Maryland filed counterclaims under the article VI of the agreement for $50 per day as liquidated damages from October 25, 1910, to January 12, 1911, when it was conceded the liability terminated by a fire at the works of the Northwestern Terra Cotta Company. The District Court found they were not entitled to recover such damages under the rule laid down in 25 Am. & Eng. Enc. of Law (2d Ed.) 524, that:

"It is also a generally prevailing rule that where there are·two or more defendants jointly sued by the plaintiff, one or more of such defendants less than all cannot set off a debt due from the plaintiff to him or them only"

—and the citation in the same connection that in such cases one defendant cannot recover affirmatively upon a counterclaim, and held that, although there was due Caldwell & Drake upon the counterclaim $3,950 as liquidated damages, they could not recover the difference between this sum and $3,022.06, but sustained a motion to direct a verdict for the defendants, and the jury was accordingly directed to find for the defendants, and returned a verdict as directed, and judgment was rendered upon the verdict, and the original plaintiff sued out this·writ of error.

The decision of the District Court was based largely upon Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, but before considering and analyzing that case, it is well to refer to a few earlier cases in the Supreme Court on the subject.

[2, 3] There are numerous cases in which the law does not enforce contracts according to their literal interpretation. This is true generally of bonds, other than penal ones, which usually provide for a fixed liability upon condition, but upon condition broken the law enforces, not the contract according to its literal interpretation, but for the amount of the actual damages. The same is true of mortgages which in form are conveyances of the property upon condition, but which are not enforced in modern times to the letter, but simply as the security for the amount due. In reference to statutes it is said:

"A court is not always confined to the written word. Construction sometimes is to be exercised as well as interpretation. And 'construction is the drawing of conclusions respecting subjects that lie beyond the direct expression of the text from elements known from and given in the text—conclusions which are in the spirit, though not within the letter of the text.' Lieber, 56." United States v. Farenholt, 206 U. S. 226, 229, 27 Sup. Ct. 629, 631 [51 L. Ed. 1036].

[4] If this be applicable to contracts, then the rules as to other than penal bonds and as to mortgages involve construction rather than interpretation, and the same is true of contracts which it is claimed contained latent ambiguities as to whether they provided for liquidated damages or a penalty. It is settled by abundant authorities that the mere use of the terms "penalty," "forfeiture," "liquidated damages," or "stipulated damages," is not conclusive as to the true construction. United States v. Bethlehem Steel Co., 205 U. S. 105, 120, 27 Sup. Ct. 450, 51 L. Ed. 731; 5 Words and Phrases, 4179; 3 Words and Phrases (2d Series) 150.

In Tayloe v. Sandiford, 7 Wheat. 13, 15, 5 L. Ed. 384, Chief Justice Marshall said:

"Is the sum of $1,000 mentioned in the agreement of the 13th of May, to be considered as a penalty, or as stipulated damages? The words of the reservation are, 'The said house to be completely finished on or before the 24th day of December next, under the penalty of $1,000 in case of failure.' In general, a sum of money, in gross, to be paid for the nonperformance of an agreement, is considered as a penalty, the legal operation of which is to cover the damages which the party, in whose favor the stipulation is made, may have sustained from the breach of contract by the opposite party. It will not, of course, be considered as liquidated damages; and it will be incumbent on the party who claims them as such to show that they were so considered by the contracting parties. Much stronger is the inference in favor of its being a penalty when it is expressly reserved as one. The parties themselves denominate it a penalty; and it would require very strong evidence to authorize the court to say that their own words do not express their own intention. These writings appear to have been drawn, on great deliberation; and no slight conjecture would justify the court in saying that the parties were mistaken in the import of the terms they have employed."

In Van Buren v. Digges, 11 How. 461, 13 L. Ed. 771, it was held that if a contract for the construction of a house provided that if the house was not finished by a certain day a deduction of 10 per cent. from the price should be made, the contract provided for a penalty, and evidence offered to prove that this forfeiture was intended as liquidated damages was properly rejected. See Clark v. Barnard, 108 U. S. 436, 2 Sup. Ct. 878, 27 L. Ed. 780.

In Hart v. Pennsylvania Railroad Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, the plaintiff shipped five horses and other property from Jersey City to St. Louis. The bill of lading recited:

"That the carrier assumes a liability on the stock to the extent of the following agreed valuation: If horses or mules not exceeding two hundred dollars each."

The court held this was a contract for stipulated damages, and no more could be recovered. The Congress (Act March 4, 1915, c. 176, 38 Stats. 1197) declared all such contracts void. It may not be amiss to say that a number of states have by statute, with various limitations or modifications, declared liquidated damage contracts void.

In Watts v. Camors, 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406, by a charter party it was stipulated.

"To the true and faithful performance of all and every of the foregoing agreements we, the said parties, do hereby bind ourselves, our heirs, executors, administrators and assigns, and also the said vessel, freight, tackle and appurtenances, and the merchandise to be laden on board, each to the other, in the penal sum of estimated amount of freight."

The estimated amount of freight was $20,872.50. It was held clearly not a stipulation for liquidated damages.

In Bignall v. Gould, 119 U. S. 495, 7 Sup. Ct. 294, 30 L. Ed. 491, a bond was given in the penal sum of $10,000 liquidated damages, conditioned that if said parties should, within a year, acquit, release, and discharge the said Moses C. Bignall of all and singular the debts and claims aforesaid by a good and sufficient release in writing, then this

obligation to be void; otherwise it shall remain in full force and virtue. The court affirmed a judgment for 1 cent upon the bond saying:

"By the rules now established, at law, as well as in equity, the sum of $10,000, named in this bond, is a penalty only, and not liquidated damages."

We come now to Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366. In that case a yacht had been chartered by the managing editor of the Sun for the purpose of collecting news in the vicinity of Cuba during the war with Spain. The first contract was made on April 1, 1898, and was for two months, but by a new contract this was extended to six months. Early in September, 1898, the yacht was wrecked, becoming a total loss. Mr. Justice White, now Chief Justice, delivered the opinion of the court. The agreement contained these provisions:

That the hirer should keep

"said yacht in repair and to pay all its running expenses, and to surrender said yacht with all its gear, furniture and tackle at the expiration of this contract to the owner or his agent * * * in as good condition as at the start, fair wear and tear from reasonable and proper use alone excepted"

—and that the hirer

"shall be liable and responsible for any and all loss and damage to hull, machinery, equipment, tackle, spars, furniture or the like."

"That for the purpose of this charter the value of the yacht shall be considered and taken at the sum of seventy-five thousand dollars ($75,000.00)."

"That in the event of the failure of the hirer to return and surrender the said yacht to the owner as hereinbefore provided, the hirer shall be charged demurrage and pay demurrage to the owner at the rate of five hundred dollars ($500.00) per day for each and every day's detention."

The court held the first two provisions imposed upon the hirer, not a liability for negligence, but an absolute liability to return the yacht in good order, and of course with that we have nothing to do. It then held that the parties had agreed on the value of the yacht, and of course, in the absence of fraud or the like, that fixed the amount of the liability of the hirer.

[5] In all this there is nothing throwing any light upon the question now under consideration, but certain language is used by Mr. Justice White in his very able opinion, which it is claimed applies to the case at bar. In view of the learning displayed in the opinion it is with some hesitancy that we call attention to the fact that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. Cohens v. Virginia, 6 Wheat. 264, 398, 5 L. Ed. 257; King v. Pomeroy, 58 C. C. A. 209, 216, 121 Fed. 287, 294; Traer v. Fowler, 75 C. C. A. 540, 547, 144 Fed. 810, 817; Mason City & Ft. D. R. Co. v. Wolf, 78 C. C. A. 589, 596, 148 Fed. 961, 967; Schaap v. United States, 127 C. C. A. 415, 210 Fed. 853; Joplin Mercantile Co. v. United States, 131 C. C. A. 160, 213 Fed. 926.

In the case under consideration, Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, if suit had

been delayed for substantially 10 years, the usual period of limitations on written contracts, and the owner of the yacht had then brought suit for $500 a day, or for $1,750,000, under the demurrage clause noticed, and the court had held that he was entitled to recover in that amount for the use of a yacht worth $75,000, the case would have been quite in point, but that question was not raised.

In United States v. Bethlehem Steel Co., 205 U. S. 105, 27 Sup. Ct. 450, 51 L. Ed. 731, it was held that where a contract was let by the government to construct gun carriages it was admissible to show that before the contract was made negotiations had taken place between the government and the steel company with reference to the speed at which the carriages would be furnished for prospective use in the Spanish war. The government had advertised for propositions for six disappearing gun carriages. The company had put in four distinct bids, one at $31,000 each to be delivered within six months, a second at $33,000 each, the first to be delivered in five months, and one every month thereafter, the third at $35,000 each, the first to be delivered within four months, the second within five months, the remainder at the rate of three every two months thereafter, the fourth at $36,000 each, the first in four months, the second in five months, and the remainder at the rate of two every month thereafter. The contract was let substantially on the fourth proposition at the highest price named. It provided that if any carriage was not delivered at the time specified, there should be deducted in the discretion of the Chief of Ordnance $35 per day from the price to be paid therefor for each day of delay in delivering each carriage. This was based upon an averaging of the increased cost for speed. The provision in the contract was not upon its face ambiguous, but the court approved the taking of all this evidence as to prior negotiations to determine whether the contract was for liquidated damages or a penalty. See United States v. United Engineering Co., 234 U. S. 236, 34 Sup. Ct. 843, 58 L. Ed. 1294; Stone, Sand & Gravel Co. v. United States, 234 U. S. 270, 34 Sup. Ct. 865, 58 L. Ed. 1308; and Maryland Dredging & Contracting Co. v. United States, 241 U. S. 184, 36 Sup. Ct. 545, 60 L. Ed. 945. These being substantially all the decisions by the Supreme Court, we turn to the decisions of this court.

In Brooks v. City of Wichita, 52 C. C. A. 209, 114 Fed. 297, the Wichita Railway, Light & Power Company entered into a contract with the city of Wichita by which it agreed to furnish the city with 150 2,000 candle power, lights and have the same in operation by April 1, 1899, and then provided:

"And it is further agreed that in the event that the said first party shall fail to furnish and put in operation for the use of the said city the one hundred and fifty (150) arc lights before referred to by the first day of April, 1899, then it is agreed that the said first party is to forfeit and pay to said second party, as liquidated damages, and not as a penalty, the sum of ten thousand ($10,000) dollars now on deposit with the city treasurer of the city of Wichita. It is further agreed that the ten thousand dollars ($10,000) is to be treated as liquidated damages in case of a breach of this contract, for the reason that the actual damages sustained by the said city in case of a

breach of this contract cannot be definitely or accurately estimated or computed."

It was held this was a contract for liquidated damages and it was enforced accordingly.

In Pressed Steel Car Co. v. Eastern Ry. Co., 57 C. C. A. 635, 121 Fed. 609, this court held that a contract for the furnishing of 400 steel hopper ore cars and for the payment by the vendor of $5 a day for each car not delivered by the time specified could be enforced as a contract for liquidated damages and not a penalty, and held the steel company was not liable for any time that its delay was excusable under the contract.

In Manhattan Life Insurance Company v. Wright, 61 C. C. A. 138, 126 Fed. 82, it was held that where one borrowed money upon his life insurance upon the security of a policy having a large paid-up value, and his note contained a stipulation that:

"If this note is not paid when due the said policy is void and the Manhattan Life Insurance Company is hereby expressly released from any liability, claim or demand"

—an action to redeem would lie long after the maturity of the note, and that the provision for forfeiting the policy was void. See United Shoe Machinery Co. v. Abbott, 86 C. C. A. 118, 158 Fed. 762; Turner v. City of Fremont, 95 C. C. A. 455, 170 Fed. 259.

In McCall v. Deuchler, 98 C. C. A. 169, 174 Fed. 133, this court, composed of three judges, all of whom are now judges of the court, held that a clause in the contract for the sale of fashion sheets, that:

"If either of us shall intentionally break this contract, or shall refuse or fail promptly to perform the same after two weeks' notice in writing given by the other, then the other of us shall have the right to, exercise the option of being released from all future obligations under it, and to recover and receive as liquidated damages, and not as a penalty, a sum equal to the agreed charge for fashion sheets during the entire term of this contract. Failure to require compliance with the strict letter of this contract order shall not forfeit nor prejudice any right thereunder, nor constitute a waiver thereof"

—did not provide for liquidated damages, and the court called attention to the fact that Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, was a case of an agreed valuation of property. See Union Pacific R. Co. v. Mitchell-Crittenden Tie Co., 111 C. C. A. 396, 190 Fed. 544.

In C., B. & Q. Ry. Co. v. Dockery, 115 C. C. A. 173, 195 Fed. 221, we held that where there were several agreements in a contract the damages for nonperformance of some of which are readily ascertainable and for others not, and one sum is named as damages for breach of any of them, the sum will be regarded as a penalty for the breach of any single stipulation. See Bankers' Surety Co. v. Elkhorn River Drainage Dist., 130 C. C. A. 650, 214 Fed. 342. These are substantially all the decisions of this court, and, not finding any cases on all fours with this one, we turn to the decisions in other circuits for those cases most nearly in point.

The case of Gay Manufacturing Co. v. Camp, 13 C. C. A. 137, 65 Fed. 794; Id., 68 Fed. 67, 15 C. C. A. 226, was declared by the Su-

preme Court in Sun Printing & Publishing Ass'n v. Moore, supra, to be wrong in principle, and not sustained by the authorities. It therefore requires no further consideration.

The same is true of Chicago House Wrecking Co. v. United States, 45 C. C. A. 343, 106 Fed. 385, 53 L. R. A. 122.

The case of East Moline Co. v. Weir Plow Co., 37 C. C. A. 62, 95 Fed. 250, announced the same rule subsequently announced by this court in C., B. & Q. Ry. Co. v. Dockery, 115 C. C. A. 173, 195 Fed. 221.

In Wood et al. v. Niagara Falls Paper Co., 58 C. C. A. 256, 121 Fed. 818, turbines were to be furnished and an agreement made that the contractor would pay $50 a day after October 1, 1896, for each day's delay in delivering each turbine. This was a contract for liquidated damages, and it was held the same could be recovered entirely independent of actual damages. It will be noticed that while the contract was for two turbines, the stipulation was in effect separate as to each, so that the damages were proper only upon a total failure to deliver each turbine. A somewhat different question would have arisen if the stipulation was that until the final completion of the entire contract, and while using one of the turbines, the sum of $100 a day could be recovered, thus making the damages the same for the total failure to furnish any turbines and of the failure to furnish one.

Stephens v. Phœnix Bridge Co., 71 C. C. A. 374, 139 Fed. 248, was a suit under a contract by the Phœnix Bridge Company to furnish material for the construction of a viaduct in the city of New York by a specified time, which had been let to Stephens. By this contract the bridge company stipulated that it was "to be subject to a penalty of one hundred dollars per day for any time beyond that day." This was held not a contract for liquidated damages.

In Davis v. Alpha Portland Cement Co., 73 C. C. A. 388, 142 Fed. 74, the cement company had contracted to sell 200,000 barrels of cement to Davis and further that: "We will pay you 15c per barrel as liquidated damages for each and every barrel short of the two hundred thousand barrels." This was not only held to be a contract for liquidated damages, but exclusive of all other damages. It will be observed that this was an agreement to pay 15 cents upon each barrel not delivered, not an agreement to pay a large sum per day for an indefinite time upon the failure to deliver any small portion of the cement.

In Stephens v. Essex County Park Commission, 75 C. C. A. 60, 143 Fed. 844, Stephens had contracted to construct two subways for the defendant, and by another contract had agreed to construct three shelters and one public lavatory. There was a stipulated damage clause for the payment of $25 for each day after the stipulated time for completion of the work. This claim was enforced.

In Chapman Decorative Co. v. Security Mutual Life Ins. Co., 79 C. C. A. 137, 149 Fed. 189, in the same court, the plaintiff brought suit for decorative work done for defendant in an office building in the main entrance and on the eighth floor. There was a provision

in the contract that there should be due and payable by the plaintiff to the defendant as liquidated damages $50 a day for each and every day after March 15, 1905, that the same remains unfinished and incomplete. The plaintiff was held liable for the stipulated sum.

While we have the highest regard for the judges who rendered these decisions, we think the holdings were in conflict with our holding in C., B. & Q. Ry. Co. v. Dockery, 115 C. C. A. 173, 195 Fed. 221, and East Moline Co. v. Weir Plow Co., 37 C. C. A. 62, 95 Fed. 250, and O'Brien v. Illinois Surety Co., 121 C. C. A. 546, 203 Fed. 436, and consequently we could not follow them.

In Blodget v. Columbia Live Stock Co., 90 C. C. A. 237, 164 Fed. 305, the lessee in an oil and gas lease agreed that if he failed to sink a well he would forfeit $1,500 as liquidated damages. It was properly held he became liable for that sum when he sunk no well at all. This was clearly within the rule announced in Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, and United States v. Bethlehem Steel Co., 205 U. S. 105, 27 Sup. Ct. 450, 51 L. Ed. 731. See Jefferson Hotel Co. v. Brumbaugh, 94 C. C. A. 279, 168 Fed. 867; Rasmussen v. Home Industry Iron Works, 117 C. C. A. 666, 199 Fed. 990, affirming The Colombia (D. C.) 197 Fed. 661.

In O'Brien v. Illinois Surety Co., 121 C. C. A. 546, 203 Fed. 436, the lessee gave a bond of $5,000 that he would erect during the first year a brick building of fireproof construction, substantial and modern in all respects, not less than two stories in height, having a frontage of not less than 60 feet and a depth of not less than 50 feet, the front to be of pressed brick, with stone trimmings. The bond also provided that all building laws would be observed, and no mechanics' or material liens should exist against the building. The lessee did nothing, and suit was brought for the penalty of the bond. The court announced the same rule promulgated by this court in C., B. & Q. R. Co. v. Dockery, 115 C. C. A. 173, 195 Fed. 221, and in East Moline Cc. v. Weir Plow Co., 37 C. C. A. 62, 95 Fed. 250. Judge Denison, speaking for the court, said:

"The first condition, the erection of the building, permitted a great variety of breaches, which might have ranged from the total absence of any building all the way down to some slight deficiency in form or size or trimmings. It is not to be supposed that the parties contemplated the payment of $5,000 if the builder used plain brick, instead of pressed brick, on the front, and the payment of the same amount if there was no building at all. The sum named in the bond was clearly a penalty, intended to indemnify O'Brien against such damages as the law might declare owing to him for any breach of any condition of the bond."

See Coal & Iron Ry. Co. v. Reherd, 123 C. C. A. 155, 204 Fed. 859.

In Bedford v. Miller, 129 C. C. A. 44, 212 Fed. 368, it was held that where a subcontractor gave a bond with a $50 a day liquidated damage clause, and it appeared that the contractor had given a similar contract to the government, and the condition in the subcontractor's bond was in part to protect him on his bond to the United States, and the government released him from his liability, no recovery could be had as liquidated damages, but only actual damages.

See Board of Commerce of Ann Arbor v. Security Trust Co., 140 C. C. A. 486, 225 Fed. 454; Atlantic City v. Warren Bros. Co. et al., 141 C. C. A. 202, 226 Fed. 372; Fleischman v. Rahmstorf, 141 C. C. A. 273, 226 Fed. 443. None of the authorities cited seem to be conclusive of the case at bar.

[6] The contract in question expressly provided it was not a building contract, but for the furnishing of materials to be used in performing a building contract, and that the same should be furnished and delivered f. o. b. the cars in Chicago. Under such a contract it would be construed according to the laws of Illinois. Cox v. United States, 6 Pet. 170, 203, 8 L. Ed. 359; Boyle v. Zacharie, 6 Pet. 635, 644, 8 L. Ed. 527; United States v. Daniel, 12 Pet. 30, 54, 9 L. Ed. 989; Andrews v. Pond, 13 Pet. 64, 77, 10 L. Ed. 61; Musson v. Lake, 4 How. 262, 277, 11 L. Ed. 967; Cook v. Moffat, 5 How. 295, 307, 12 L. Ed. 159; Brabston v. Gibson, 9 How. 262, 277, 13 L. Ed. 131; Miller v. Tiffany, 1 Wall. 298, 310, 17 L. Ed. 540; Scudder v. Union National Bank, 91 U. S. 406, 412, 23 L. Ed. 245; Supervisors v. Galbraith, 99 U. S. 214, 218, 25 L. Ed. 410; Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; Washington Central Bank v. Hume, 128 U. S. 195, 207, 9 Sup. Ct. 41, 32 L. Ed. 370; Coghlan v. South Carolina Railroad Co., 142 U. S. 101, 12 Sup. Ct. 150, 35 L. Ed. 951; Hall v. Cordell, 142 U. S. 116, 120, 12 Sup. Ct. 154, 35 L. Ed. 956; London Assurance v. Companhia De Moagens, 167 U. S. 149, 160, 17 Sup. Ct. 785, 42 L. Ed. 113; Mutual Life Ins. Co. v. Phinney, 178 U. S. 327, 338, 20 Sup. Ct. 906, 44 L. Ed. 1088; Bedford v. Eastern Building & Loan Ass'n, 181 U. S. 227, 242, 21 Sup. Ct. 597, 45 L. Ed. 834. While the contract must therefore be construed according to the laws of Illinois, what laws? The statutes or the decisions of the court of last resort?

In Swift v. Tyson, 16 Pet. 1, 17, 10 L. Ed. 865, Story, Justice, delivering the opinion of the court, said:

"But, admitting the doctrine to be fully settled in New York, it remains to be considered whether it is obligatory upon this court, if it differs from the principles established in the general commercial law. It is observable that the courts of New York do not found their decisions upon this point, upon any local statute, or positive, fixed, or ancient local usage; but they deduce the doctrine from the general principles of commercial law. It is, however, contended, that the thirty-fourth section of Judiciary Act 1789, c. 20 [Comp. St. 1913, § 1538], furnishes a rule obligatory upon this court to follow the decisions of the state tribunals in all cases to which they apply. That section provides 'that the laws of the several states, except where the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision, in trials at common law, in the courts of the United States, in cases where they apply.' In order to maintain the argument, it is essential, therefore, to hold, that the word 'laws,' in this section, includes within the scope of its meaning the decisions of the local tribunals. In the ordinary use of language, it will hardly be contended that the decisions of courts constitute laws. They are, at most, only evidence of what the laws are, and are not, of themselves, laws. They are often re-examined, reversed, and qualified by the courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a state are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. In all the various cases, which have hitherto come before us

for decision, this court have uniformly supposed that the true interpretation of the thirty-fourth section limited its application to state laws, strictly local; that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed by us that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves; that 'is, to ascertain, upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case."

To the same effect are Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627; Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359; Baltimore & Ohio Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; Gardner v. Michigan Central Railroad Co., 150 U. S. 349, 14 Sup. Ct. 140, 37 L. Ed. 1107; Chicago, M. & St. P. Ry. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688; Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228; Independent School Dist. v. Rew, 49 C. C. A. 198, 208, 111 Fed. 1, 11, 55 L. R. A. 364; Guernsey v. Imperial Bank of Canada, 110 C. C. A. 278, 280, 188 Fed. 300, 302, 40 L. R. A. (N. S.) 377; and Colorado Yule Marble Co. v. Collins, —— C. C. A. ——, 230 Fed. 78. With these cases in mind we have examined but have been unable to find any statutes of Illinois governing the construction of such a contract. Consequently we conclude that the decisions of Illinois are not conclusive, but the Supreme Court of the United States in Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 24, 46 L. Ed. 366, said:

"The character of the stipulation under consideration renders it unnecessary to review in detail the decisions of the state courts. There is in them much contrariety of opinion on some phases of the doctrine, but our attention has not been called to any case which sustains the contention that a valuation clause, such as that we are considering, contained in a contract made under circumstances like those which existed when this contract was executed, must be disregarded despite the evident intention of the parties to treat the sum named as estimated and ascertained damages for a breach of the covenant to return the yacht."

[7] The decisions of no state can be conclusive on this court under the circumstances, but such decisions will be persuasive. There are many hundreds, if not thousands, of state court decisions upon the question of whether a contract shall be construed as providing for liquidated damages or a penalty, and we cannot therefore review them all, but must decide this case from our knowledge of the decisions cited and our general knowledge of the decisions of other English and American authorities and we hold:

[8] First, that the contract in question did not provide for liquidated damages. We do this by analogy to the rule announced in C., B. & Q. R. Co. v. Dockery, 115 C. C. A. 173, 195 Fed. 221, in this court, and East Moline Co. v. Weir Plow Co. (Seventh Circuit) 37 C. C. A. 62, 95 Fed. 250, and O'Brien v. Illinois Surety Co. (Sixth Circuit) 121

C. C. A. 546, 203 Fed. 436, and the following state authorities: Heatwole v. Gorrell, 35 Kan. 692, 12 Pac. 135, 137; Gower v. Saltmarsh, 11 Mo. 271; Long v. Towle, 42 Mo. 545, 550, 97 Am. Dec. 355; Boulware v. Crohn, 122 Mo. App. 571, 99 S. W. 796, 800; Wilkinson v. Colley, 164 Pa. 41, 30 Atl. 286, 26 L. R. A. 114; Emery v. Boyle, 200 Pa. 249, 49 Atl. 779, 780; Keeble v. Keeble, 85 Ala. 552, 5 South. 149; Madler v. Silverstone, 55 Wash. 159, 104 Pac. 165, 166, 34 L. R. A. (N. S.) 1, and cases there cited. That is, when the contract was to furnish almost innumerable articles, and not to build a building, it cannot be assumed that the parties meant to stipulate for the same damages for total failure to deliver any part of the goods and for a failure to deliver a single one of the innumerable articles to be delivered. To hold otherwise would be to hold that the plaintiff was fortunate in having the fire when it did, as Caldwell & Drake have already received $3,022.06 by the directed verdict below, but as their failure to recover more was upon a technical question of pleading, they would yet be entitled, for ought we know, to recover $927.94, but this is wholly due to the fire. From the evidence it was not until about February 17, 1911, that Caldwell & Drake obtained the stone lintels, and but for the fire the recovery would have been for $1,800 more, or a total of $5,750 for what? For the failure to deliver some lintels worth in stone $41.06 and far less in terra cotta. If the coping was included, the damages would have been $8,000 for a trifling deficiency.

[9] Second, the contract was in fact substantially complied with. We should hold, but for the architect's decision which was conclusive, that the contract was literally wholly complied with, but in any event it was complied with except as to the lintels which were in dispute. We must again impress that the plaintiff was a mere material contractor. It was not to install any of the property. Suppose the contract was to furnish 10,000,000 brick, and the plaintiff had substantially furnished that number, but through inadvertence the delivery was 2 or 3 bricks short of the 10,000,000. Would that subject the plaintiff to $50 a day for an indefinite time? The contract here in question was 99⅔ per cent. performed, and as between holding that such was a substantial compliance with the contract and holding that for an absence of one-third of 1 per cent. in the materials furnished the plaintiff became liable for thousands of dollars, we would have no hesitancy, and would hold there was substantial compliance with the contract.

Some reliance is placed upon the reciprocal character of the provision in question upon the fact that Caldwell & Drake agreed to pay the contractors a bonus of $50 for each and every day the work was completed prior to October 25, 1910. The contract was made on the 10th day of August, 1910. It provided for furnishing $13,000 worth of ornamental terra cotta according to detailed plans. This had to be manufactured specially for the job, and the contract provided for a bonus of $50 a day for each day the delivery was completed prior to October 25th. It is manifest that such a contract could not be performed in much less time than that reserved, and there was an absolute limit on how far the $50 a day clause could run; namely to October 25th. As applicable here the word "bonus" is defined by Webster as: "3. Money

paid in addition to a stated compensation." How can it be claimed that the agreement to pay a possible "bonus" for speed with a fixed time for the bonus to cease throws any light upon an agreement to pay compensation for delay with no time for it to cease? Both sides rely upon this provision in the contract, but we are not able to see how the agreement to pay a bonus throws any light upon whether another claim is for liquidated damages or a penalty where a bonus is nowhere referred to.

It has been seen how one of the decisions of the Supreme Court has been nullified by legislation, and how several states have prohibited liquidated damage claims except under statutory limitations or with statutory modifications. To affirm this judgment would but increase the demand for additional legislation of the same character. This is simply to be considered in passing upon questions not determined by the Supreme Court.

Thinking that this decision in no way conflicts with any such decisions it would be unwise to extend any existing decisions to this case, and thereby work a revolting injustice, the case is reversed and remanded, with directions to set aside the verdict and grant a new trial.

HOOK, Circuit Judge (dissenting). The facts in this case are few, and I think the controlling principle of law has been definitely settled by the Supreme Court in Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, and United States v. Bethlehem Steel Co., 205 U. S. 105, 27 Sup. Ct. 450, 51 L. Ed. 731.

Caldwell & Drake had a contract to construct a public building. The Terra Cotta Company contracted to furnish them by a specified date all the architectural terra cotta as described in drawings and specifications. They failed to do so. The subcontract provided that the Terra Cotta Company should have a bonus of $50 for each day they completed their undertaking before the day specified, and, on the other hand, should pay as liquidated damages $50 for each day's default thereafter. It is this clause which my Brothers hold is not a contract for liquidated damages. The circumstances confronting the parties at the time—and they are determinative—seem to me to put the question beyond doubt. Default by the Terra Cotta Company might well have entailed such serious consequences to the progress of the larger work that the case was essentially one for an agreed measure. It was not like a contract for a small amount of common material which might be bought any day in the market. The express provision for bonus for earlier fulfillment shows how important both parties regarded time, and no doubt the Terra Cotta Company would have been quick to claim the bonus had they earned it. The principle governing such cases was so definitely defined by the Supreme Court that I do not think we should decline to apply it as beyond the needs of the cases in which it was announced, if indeed we should feel free to do so in a case of greater doubt.